UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NIKOLE GRADY,<br><br>        Plaintiff,<br><br>    v.<br><br>DM TRANS, LLC d/b/a ARRIVE LOGISTICS,<br><br>        Defendant. | No. 24 CV 1222<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nikole Grady was fired by her former employer, defendant DM Trans, LLC d/b/a Arrive Logistics, after requesting sick leave and saying she would fill out any "forms" needed. She sues for retaliation based on disability. DM Trans moves for summary judgment. For the reasons discussed below, the motion is granted.

**I.    Legal Standards**

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant is entitled to summary judgment if the plaintiff "cannot present sufficient evidence to create a dispute of material fact regarding any essential element of her legal claims on which she bears the burden of proof." *Burton v. Bd. of Regents*, 851 F.3d 690, 694 (7th Cir. 2017). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v.*

1

*Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022). "When both parties move for summary judgment, we take the motions one at a time, viewing the facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was made." *Ellison v. United States Postal Serv.*, 84 F.4th 750, 755 (7th Cir. 2023).

**II.   Facts**

Plaintiff Nikole Grady was diagnosed with bipolar disorder, anxiety, and depression in late 2019. [55] ¶¶ 1–2.[1] In August 2021, Grady was hired by DM Trans as a remote, at-will employee for Arrive Logistics. [55] ¶¶ 3, 5; [55] at 40 (¶ 2). When she was hired, Grady signed DM Trans's Code of Professional Conduct that said that "[e]xcessive absenteeism or unacceptable patterns of absenteeism" and "[r]epeatedly showing up or leaving work late" could result in "immediate termination." [55] ¶ 6.

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the plaintiff's response to defendant's Local Rule 56.1 statement of facts, [55], defendant's response to plaintiff's statement of facts, [62], where both the asserted fact and the opposing party's response are set forth in one document. Though Grady did not file a separate statement of additional facts, she did add additional facts in many of her responses to DM Trans's fact statements. Generally, this is not allowed under Local Rule 56.1(b)(3) and (e)(2). However, because DM Trans responded with its own Local Rule 56.1(b)(2) response to Grady's answers, I will treat her answers as if they were a separate statement of additional facts, and cite [60], where both Grady's answers and DM Trans's responses are set forth. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). *See also* [55] ¶¶ 11, 13–14, 21–24, 26, 28–35, 37–39, 41–44, 46–50, 52–55, 57–59, 61–67, 69–70; [62] ¶¶ 13–15, 21, 23, 28–29, 34. I also disregard facts not supported by citations. N.D. Ill. Local R. 56.1(d)(2). *See* [60] ¶¶ 6–7, 9, 12–13, 28, 30, 42, 44–45, 48, 52, 53, 56, 58–59, 63, 65, 67–68; [62] ¶¶ 12–13, 15, 17–20, 22–23, 25, 30–32. To the extent a disputed fact is relevant and the parties rely on admissible evidence, I include both sides' version, understanding that the nonmovant is entitled to favorable inferences.

She also signed the company's handbook, which said employees could be fired without advance notice for "[e]xcessive tardiness or a poor attendance record" or any other handbook policy violation. [55] ¶ 7. DM Trans's leave policy required employees to request vacation leave at least two weeks in advance, unless approved by management. [55] ¶ 8. Sick time and floating holidays did not require two weeks' advance notice. [60] ¶ 9. Instead, sick leave, which could be used "for personal illness, well-care and medical, dental and vision appointments," required at least thirty minutes notice before a scheduled shift. [55] ¶ 9.

In August 2022, Grady called in sick to miss part of three workdays. [55] ¶ 13. There is no evidence that any of these calls violated Arrive's sick leave policy. [55] ¶ 13. On August 17, Grady told human resources she was experiencing loss of sleep and lack of sleep. [55] ¶ 14. The next day, Grady told her new supervisor, Adolfo Bula, and her department manager (Bula's supervisor) that she felt Bula was "trying to get [her] fired," that she had "not slept" and that she had "been walking on eggshells." [55] ¶ 16; [55] at 53; [62] ¶ 10. There is no evidence that this complaint was investigated or responded to. [62] ¶ 11.

In early September, human resources associate business partner Heather Heintz sent Grady an email telling her that the company allowed a negative vacation balance of up to two days if needed. [56] ¶ 30; [62] ¶ 23.[2] Grady left early on September 19, came to work late on September 20, left early on September 21, and arrived late on September 22. [55] ¶ 15; [62] ¶ 16. When Bula asked about her

---

[2] Grady has two fact statements numbered 23; this citation is to the second number 23.

3

tardiness on September 22, Grady responded, "yeah my bad overslept." [55] ¶ 17. The next day, Grady met with Bula and Heintz. [55] ¶ 18, [62] ¶ 16. After the meeting, Heintz sent a follow up email reminding Grady that "for future instances where you would need to leave early, or come in late to your shift, that is treated as PTO and needs to be requested 2 weeks in advance." [55] ¶ 18. Grady was not issued a write-up. [62] ¶ 17.

During the meeting, Grady said she told Heintz and Bula that she would be requesting time off for a date less than two weeks in advance—October 4, her birthday. [55] ¶¶ 19–20; [62] ¶ 18. Grady testified both that she was requesting time off for her birthday and also that she did not actually ask for time off for her birthday. [37-1] at 39 (182:15–19), 40 (183:15–16), 41 (184:12–13). Grady said her birthday was discussed during the call, and then everyone also discussed Grady taking time off. [37-1] at 42–43 (185:8–186:21). She also told Heintz that she "wanted to take some time off because of [Bula's] micromanaging." [37-1] at 43 (186:1–7). Grady said that Heintz told her that Grady "still needed some time off -- or you know, I still could take a break because she mentioned that, you know, I've been working so hard, and she mentioned here. I didn't even take 15-minute breaks, and I told her I .... 'I still will be submitting time.'" [37-1] at 43 (186:17–23). Grady later wrote that Heintz told her, "even if it's not two weeks the time still maybe [sic] approved." [55] ¶ 22.

The next day, Grady requested time off for the second part of her shift on October 4. [55] ¶ 23; [37-1] at 48–49 (192:18–193:5). Grady testified that she requested off "[b]ecause of the micromanaging, harassment, bullying [by Bula]. [She]

4

wanted to leave with [the department manager]. [She] didn't want to stay on the clock with [Bula] by [her]self." [37-1] at 49 (193:6–11). She denied that the request for time off was for her birthday, but rather because she was "getting micromanaged and bullied." [37-1] at 50–51 (198:16–199:2); [60] ¶ 43. She also said she submitted the time off for October 4 because she "didn't want to be there." [37-1] at 50 (198:1–15). Grady submitted the request as sick leave because she had already used all of her available vacation time. [55] ¶ 24. Her request was not immediately approved nor denied. [55] ¶ 27.

On October 3, Bula denied Grady's request for time off on October 4. [55] ¶ 28; [60] ¶ 27. Grady was again late to work, this time because she overslept due to a prescription medication. [37-1] at 54 (202:3–6); [55] ¶ 29. When she arrived at 2:29 p.m., Grady called Heintz. [55] ¶ 30; [37-1] at 57 (205:18–24). Heintz did not answer, and Grady followed up with messages, asking: "Can i use my sick time tomorrow my vacation request was denied." [55] ¶ 32; [60] ¶ 31.

At 2:45, Bula messaged Grady asking if her absence the next day was due to a medical appointment and asked if she needed to attend the doctor. [55] ¶ 40; [37-1] at 107. Grady responded "nope." [55] ¶ 41. She also told Bula that "under eeoc and idhr you are not even supposed ask [sic] me why am I taking off." [60] ¶ 41; [62] ¶ 22; [37-1] at 108. She continued, "BY LAW you are not supposed to ask me about time off. either approve it or not but asking me about a dr appt is off the table." [60] ¶ 41; [62] ¶ 22; [37-1] at 108.

5

Grady called Heintz again at 2:47 p.m. [37-1] at 112. At 2:50, Grady sent Heintz three images of medical paperwork from 2019 documenting that she had depression and generalized anxiety disorder, and that the conditions were not minor and were permanent. [55] ¶ 33; [62] ¶ 24; [37-1] at 112, 115–16. She told Heintz, "if u need a form filled out please email it over and i will take a few days off. schedule a appt and get those filled out." [55] ¶ 33; [62] ¶ 24; [37-1] at 114. Grady alleges that this was a request for Family and Medical Leave Act paperwork so that she could "schedule an appointment and get the FMLA paperwork squared out." [55] ¶ 34. Before this, Grady had not told the company she had any sort of disability or mental health issues. [55] ¶ 38; [37-1] at 54 (202:12–20).

Heintz responded, "If your PTO was not submitted within a two weeks' notice, our policy does state that it may not be approved." [55] ¶ 35. Grady then repeated her request to "use [her] sick time" for her time-off request for the next day. [55] ¶ 36; [60] ¶ 48. Grady alleges that this exchange was a request for accommodation and medical leave. [55] ¶ 37.

At 2:55 p.m., Bula asked Grady, "How important is your time off tomorrow?" and explained that he needed the entire team present to "stress test[]" a new system. [55] ¶ 42. Grady responded that she "had this day planned for a while, I have time and plan on using it sorry." [55] ¶ 43; [37-1] at 107. Grady told Bula that the situation "fe[lt] so much like work place bulling [sic]," and that even though her request was not made with two weeks' notice, Heintz had told her it would still be approved, and that "8 working days are enough time for [her] shift to be covered." [55] ¶ 45; [37-1]

6

at 108. Grady also told Bula that she "underst[ood] [his] frustration because [he] [would] be short tomorrow," and that if he wanted to "take things in a different direction be my gue[st]." [55] ¶ 46. Bula told Grady that he had not approved her time off, and that he was concerned about an absence "on a date that is so crucial for the team." [55] ¶ 47.

Around the same time as she was messaging with Bula, Grady reached out to her department manager and said that "moving forward i will call off no warning even if i due [sic] know in advance if it does not meet the two week window." [55] ¶ 49. She also told the department manager, "I will not be in tomorrow." [37-1] at 109; [55] ¶ 50. The department manager said, "I'm confused, I though the time off was already approved by someone?" [37-1] at 109; [62] ¶ 23. Grady said, "I did too, I put the request in 7 working days and it was just denied today. I will use my sick time." [37-1] at 109.

At 4:19 p.m., Heintz sent an email to a human resources manager setting out the "recurring issues with [Grady] around attendance and communication." [55] ¶ 52; [62] ¶ 19.[3] Heintz described DM Trans's communications with Grady about her attendance, and the times in the preceding months that Grady failed to work her full scheduled shift, including times when she failed to do so without getting approval. [37-4]; [55] ¶ 53. Heintz concluded the email by writing that "[Grady] is continuously showing disregard for our attendance policies, and when asked for clarification from her manager, she is unprofessional and combative. I would like to please proceed with

---

[3] Grady disputes the accuracy of the contents of the email. [55] ¶ 52; [60] ¶ 52.

7

termination." [55] ¶ 54; [37-4]. Heintz did not send or otherwise tell the HR manager about the three images of medical documentation that Grady sent her, and the HR manager had no knowledge of the three images at any point in the process. [55] ¶¶ 55, 59. The HR manager also did not know about Grady's request to Heintz for "forms." [55] ¶ 60.

After receiving the email, the HR manager independently evaluated Grady's attendance and concluded that it fell "far short" of the company's expectations for employees in Grady's position, and that prior attempts to improve Grady's attendance without discipline had been unsuccessful. [55] ¶¶ 56–57; [37-3] ¶¶ 4–5. On the morning of October 4, the HR manager notified her supervisor, Vice President of People Operations Eric Cameron, that she would like to move forward with termination of Grady's employment due to Grady's attendance and behavioral issues. [55] ¶ 58; [37-3] ¶ 6; [37-2] ¶ 7.

Cameron then also independently considered whether dismissal was the appropriate response to the circumstances. [37-2] ¶ 8; [55] ¶ 61. Cameron did not interview Grady, obtain a statement from Heintz, or review the communications between Grady and Heintz. [60] ¶ 61. He had no knowledge of the three images Grady sent to Heintz, of Grady's request for "forms," or of any disability Grady may have had. [55] ¶ 64. Cameron concluded that Grady had repeatedly violated the company's policies and expectations, that she had not improved her behavior even after being given the opportunity to do so, and that dismissal was the appropriate next step. [37-

8

3] ¶ 8; [55] ¶ 62. Cameron decided to terminate Grady's employment and instructed the HR manager to do so. [37-3] ¶ 8; [55] ¶ 63.

Despite telling her department manager that she would not be in on October 4, Grady logged in at the beginning of her shift and instead told him that she would be leaving early. [55] ¶ 65. Before she left, DM Trans informed her it was terminating her employment effective immediately because of her attendance. [55] ¶ 66.

Grady says she had perfect attendance from August 2021, when she started employment at Arrive, until April 25, 2022. [55] at 40 (¶ 4); [62] ¶ 6. Grady also admitted that she was late to work four times in her first year of employment. [55] ¶ 12; [37-1] at 22 (134:15–17). She was never placed on a performance improvement plan or any disciplinary track prior to her dismissal. [60] ¶¶ 53, 57, 62–63. In an email from her prior supervisor, Grady was told that "if your PTO balance is spent, it can begin to effect [sic] your bonus." [56] at 52. She still received bonuses for the month of September 2022 and the days in October 2022 that she worked. [55] at 58; [60] ¶ 57.

### III. Analysis

#### A. Leave to File Oversized Brief

Grady moves for leave to file a brief in excess of the fifteen-page limit set forth in Local Rule 7.1. [63]. DM Trans seeks to strike the oversized brief in its entirety. [64]. Local Rule 7.1 limits motions and briefs in support or opposition to any motion to fifteen pages. N.D. Ill. Local R. 7.1. Any brief that does not comply with the rule is subject to being stricken. *Id.* Grady seeks leave to file what she has titled "Affidavit

9

of Nikole Grady in Support of Plaintiff's Material Facts Pursuant to Federal Rule 56 and Local Rule 56.1," which is twenty-four pages long. [51]. Like DM Trans, I take this document to be Grady's brief in support of her motion for summary judgment. There is no other document that Grady has filed that purports to be her brief in support, the "affidavit" is styled more like a brief than an affidavit, and she cites to Local Rule 7.1 in reference to this docket entry, indicating this is either a motion or a brief in support or opposition to a motion. Because Grady has filed a separate motion for summary judgment, [43], I take this as her brief in support of that motion.

I construe filings from a pro se litigant liberally. *Torres v. Brookman*, 155 F.4th 952, 957 (7th Cir. 2025). Although Grady did not follow the procedural rules, and I may require "strict compliance" with the local rules, I "prefer to decide cases on the merits when [I] can." *E.D. by Duell v. Noblesville Sch. Dist.*, 151 F.4th 907, 921 (7th Cir. 2025), then *Atkins v. Gilbert*, 52 F.4th 359, 361 (7th Cir. 2022). It is possible to decide the case on the merits here. Grady's motion for leave to file an oversized brief is granted, and DM Trans's request to strike her brief is denied.

### B.  Summary Judgment

Grady's sole remaining claim is for retaliation under the Americans with Disabilities Act. To defeat summary judgment on a claim of retaliation under the ADA, Grady must show (1) a statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and adverse action. *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024). If Grady can establish a prima facie case of retaliation, DM Trans must offer a

"legitimate, nondiscriminatory reason for its adverse action." *Brooks v. City of Pekin*, 95 F.4th 533, 539 (7th Cir. 2024) (quotation omitted). The burden then shifts back to Grady to show that DM Trans's reason was pretextual. *Id.*

There is no dispute that termination is an adverse employment action. Defendant argues that Grady has failed to show that she engaged in a statutorily protected activity or that she was fired for engaging in any statutorily protected activity.

A plaintiff engages in an activity protected by the ADA when she asserts her rights under the ADA by either "seeking an accommodation or raising a claim of discrimination due to [her] disability." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 n.6 (7th Cir. 2023) (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015)) (alterations in original). Grady claims that her complaint about Bula on August 18, that she was "very afraid that he is trying to get me [f]ired. I have not slept. … I have been walking on egg shells," qualifies as a protected activity. I take this to be an argument that Grady was retaliated against for raising a claim of discrimination due to her disability. The problem is that Grady admits that before October 3, she had not told anyone at DM Trans that she had a disability. [55] ¶ 38; [37-1] at 54 (202:12–19). And Grady's complaint was not that Bula was discriminating against her because of any disability. Indeed, in context, Grady was discussing that Bula brought in another person to what was supposed to be a one-on-one meeting, that Bula told Grady that her facial expressions were "aggressive," and that Bula often got angry with Grady for repeating back things he has said to her.

11

[55] at 53. Based on those actions, Grady felt that Bula was trying to get her fired. [55] at 53.

Statutorily protected activity "must involve a complaint indicating that 'discrimination occurred because of … [a] protected class." *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 475 (7th Cir. 2025) (quoting *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018)). There is no indication that Bula was discriminating against Grady because of her disability. Bula did not know that Grady had a disability. And in context, Grady's complaint was not that she was being discriminated against because of her status as disabled. It was a complaint that Bula was trying to get her fired for her facial expressions or for repeating back the things he said to her. Grady's complaint that Bula was trying to get her fired was not protected activity.

On the other hand, Grady has adequately shown evidence that she engaged in a protected activity when she sent Heintz documentation of permanent mental health conditions and asked for leave, including the opportunity to attend appointments and fill out any necessary forms. A "brief period of leave to deal with a medical condition could be a reasonable accommodation in some circumstances." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017); *see also Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("Time off may be an apt accommodation for intermittent conditions."). Grady sent Heintz images of paperwork that showed that she had depression and generalized anxiety disorder, that these conditions were not minor, and that the conditions were permanent. [55] at 63–64. Grady then followed those images with messages saying, "if u need a form filled out please email it over

12

and i will take a few days off. schedule a appt and get those filled out." [55] at 61. She asked to use her sick time and said, "I also can get any paperwork over to you and take off for any appt needed." [55] at 61. A reasonable jury could understand that Grady was telling Heintz about her disability and requesting an accommodation—a short leave, including attending appointments and filling out any necessary forms—for that disability. There is a genuine dispute that Grady engaged in protected activity when she requested sick leave from Heintz.

Grady must also show causation. Causation requires that "the protected conduct was a substantial or motivating factor in the employer's decision." *Trahanas*, 64 F.4th at 856 (quoting *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022)). Circumstantial evidence of causation includes "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022) (quoting *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018)).

Grady says that the timing of her firing after her protected activity shows causation. She also argues that DM Trans's reason for firing her was pretextual.

The problem Grady faces is that "[k]nowledge of the protected activity is necessary to show causation for a retaliation claim." *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022). "A supervisor simply cannot retaliate against an

13

employee for engaging in protected activity if the supervisor was not aware of the protected activity in the first place." *Id.* at 915–16. Grady argues that no one reviewed her medical paperwork before termination—this is exactly the point. There is no evidence that Cameron, the ultimate decisionmaker, knew that Grady had a disability or that she requested leave or forms on October 3—and in fact, the evidence shows he did *not* know any of those things. [55] ¶ 64; [60] ¶ 61. Because Cameron was unaware of Grady's protected activity, he could not have retaliated against her for engaging in it.

Grady attempts to address this issue by arguing that biased actions by non-decisionmakers can support liability when the biased employee influences the final decision. This is true—where a biased supervisor "who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action," a plaintiff may show causation. *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). Grady is required to present evidence that Heintz "actually harbored discriminatory animus" against her and that Heintz's "scheme proximately caused the adverse employment action." *Id.* (quoting *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018)). Even where the decisionmaker conducts an independent investigation, a biased supervisor may still proximately cause the adverse employment action if the investigation takes the supervisor's report "into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified" or if the investigation "relies on facts provided by

14

the biased supervisor." *Id.* (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)). Still, the decisionmaker need not be a "paragon of independence." *Id.* If the decisionmaker is not wholly dependent on a single source of information and there are reasons for the adverse action other than the biased supervisor's action, the employer will not be liable. *Id.*

Grady herself argues that Cameron did not look into her medical paperwork or review the communications between Grady and Heintz. There is no evidence that Cameron relied on Heintz's report at all, much less that he was wholly dependent on it. And Grady does not dispute that she left early on September 19 and 21 and arrived late to work on September 20 and 22—instead, she "acknowledges partial attendance issues" and argues only that DM Trans, at the time, treated the incidents as a "coaching moment." [55] ¶ 15; [60] ¶ 15. For all the parties' discussion of Grady's October 4 request off, Cameron's declaration only notes Grady's attendance on the September dates. [37-2].[4] There is no dispute that Grady did not follow DM Trans's attendance policies on those four days. There are reasons for firing her other than Heintz's recommendation, and Cameron says he made the decision to fire Grady based on her repeated failure to comply with DM Trans's attendance policies. [37-2] ¶ 11. There is also no evidence that Heintz's report played any role in the final decision. Grady has not shown that Heintz proximately caused her termination. Because Grady has not shown a genuine dispute that Heintz caused her termination

---

[4] Cameron also notes that Grady called in sick to miss three partial days of work in August 2022, but there is no evidence that the sick leave on those days was taken in violation of DM Trans's attendance policies. [37-2] ¶ 3.

15

because she asked for leave, summary judgment is granted for DM Trans on Grady's ADA retaliation claim.

In her response brief, and in her brief in support of her motion for summary judgment, Grady argues that she was subjected to an unprofessional and reckless workplace culture at Arrive. [50] at 2; [51] at 2–5. This argument, and its support, which relies on allegations of alcohol in the workplace, is irrelevant to Grady's ADA retaliation claim. Grady also makes arguments for retaliation under the Family and Medical Leave Act, hostile work environment under Title VII of the Civil Rights Act of 1964, and negligent retention and supervision under Illinois common law. Her only remaining claim is for retaliation under the ADA. [21] at 15–16. To the extent she argues otherwise, I disregard those arguments.

For the same reasons summary judgment is granted for DM Trans on Grady's retaliation claim, Grady's motion for summary judgment is denied.

V. Conclusion

Grady's motion for leave to file an oversized brief, [63], is granted. Grady's motion for summary judgment, [43], is denied. DM Trans's motion for summary judgment, [36], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: January 21, 2026